UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN TAMBURO, on behalf of himself and all other plaintiffs similarly situated, known and unknown,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA CORPORATION and GENESIS MOTOR AMERICA, LLC,<br><br>Defendants. | Case No. 23-cv-00282<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Hyundai Motor America Corporation and Genesis Motor America, LLC ("Hyundai") move to compel arbitration and stay proceedings in this putative class action brought by John Tamburo ("Plaintiff") under various state law claims.[1] For the reasons stated herein, the motion to compel arbitration and stay proceedings [20] is granted.

I.  Background

Plaintiff purchased a 2015 Hyundai vehicle on May 31, 2017. [1] at ¶ 36. When

---

[1] The Court has jurisdiction under U.S.C. § 1332(d). [1] at ¶ 9: "This Court has subject matter jurisdiction under 28 U.S.C. §1332(d). The amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs. There are more than 100 class members. Plaintiff is a citizen of Illinois. Defendants are citizens of California."

1

Plaintiff purchased his vehicle, he believed the vehicle was equipped with a Blue Link feature and "connected services", including an SOS emergency button and crash reporting. *Id*. at ¶ 37.

Hyundai offers Blue Link and connected services to its customers, which they can purchase along with their vehicle. Upon connected services enrollment, customers must agree to the then-effective Connected Services Agreement ("CSA") [22] at ¶ 3 (Declaration of Vijay Rao "Rao Decl."). Users confirm their enrollment and assent to the CSA by clicking a box next to language stating: "I have read and agree to the Blue Link Terms and Conditions", shown below.

 I have read and agree to the Blue Link Terms & Conditions

*Id*. at ¶ 8; [22-3].

The underlined "Terms and Conditions" link to the CSA, allowing users to review them. [22] at ¶ 8 (Rao Decl.). The CSA confirmed that it is the agreement governing the "provision of Connected [S]ervices" to Plaintiff. [22] at ¶ 8 (Rao Decl.); [22-1] at 1. The CSA further provides that users indicate acceptance of the CSA by "activat[ing], receiv[ing], us[ing], accept[ing] or otherwise access[ing]" the connected services. [22-1] at 1. Hyundai claims it makes a copy of the CSA available to every customer who enrolls in the connected services plan. [22] at ¶ 3 (Rao Decl.). Hyundai further claims Plaintiff initially enrolled in the CSA at the dealership. *Id*. at ¶¶ 6-8.

On June 8, 2017, after Plaintiff signed all the required documents in connection with his vehicle's purchase, a dealership employee told Plaintiff that the Blue Link

and connected services needed to be activated. [26-1] at ¶ 14 (Declaration of John Tamburo "Tamburo Decl."). Plaintiff claims the employee did not inform him that he must accept the terms and conditions of the CSA to activate the Blue Link and connected services. *Id.* at ¶ 18. Plaintiff claims he was not informed the CSA contained an arbitration provision. *Id.* at ¶ 19. Plaintiff further claims he was not informed that assent to the terms would require him to forfeit his right to proceed in court. *Id.* at ¶ 25.

After Plaintiff's subscription lapsed, Plaintiff resubscribed in 2021, again agreeing to the CSA. [22] at ¶¶ 9-11 (Rao Decl.). To resubscribe, Plaintiff logged into a Customer Web Portal, which stated "By clicking login, you agree that you have read our Privacy Policy and, if you are a connected services subscriber, agree to the Terms and Conditions.", shown below.



3

*Id.*; [22-5].

The underlined "Terms & Conditions" linked to the CSA, allowing users to review them. [22] at ¶¶ 9-11 (Rao Decl.). As part of the reactivation process, Plaintiff agreed to the CSA *again* when he checked the box acknowledging that he "agreed to the Terms & Conditions" upon payment. *Id.* To reactivate, users are required to click the box agreeing to the CSA, shown below. *Id.*

*Id.*; [22-7].

The CSA contained arbitration and class action provisions:

> Hyundai and you agree to arbitrate any and all disputes and claims between us arising out of or relating to the Agreement, Connected Services, Connected Services System, Service Plans, [or] your Vehicle, . . . to the maximum extent permitted by applicable law. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us subject to arbitration to the fullest extent permitted by law.

*Id.*; [22-6] at § 15.C.

4

> YOU AND HYUNDAI AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN [AN] . . . INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING[.]

*Id.*; [22-6] at § 15.C(e) (emphasis in original).

The Agreement further provides that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's terms and conditions." [22-6] at § 15.C(c). The CSA provides that Consumer Arbitration Rules of the American Arbitration Association govern any arbitration. *Id*.

On June 1, 2022, Plaintiff logged into the Connected Services mobile app. [22] at ¶¶ 12-14 (Rao Decl.). Plaintiff was required to agree to an updated version of the CSA. *Id*. To do so, Plaintiff clicked a box acknowledging agreement to the "<u>Hyundai Terms and Conditions</u>," shown below.

> Please review and agree to the
> Bluelink Terms & Conditions and the
> Hyundai Motor America Privacy Policy
> below.
>
> ☑ I agree to the Hyundai Terms and Conditions.
>
> ☑ I understand and agree to the Hyundai Privacy Policy and to the collection, use and disclosure of vehicle data and personal information, including precise geolocation and other sensitive information, as set forth in the Vehicle Services & Technologies Privacy Notice, which also describes my privacy choices.
>
> **SUBMIT**
>
> Dismiss and Return

*Id.* at ¶ 14; [22-9].

The updated CSA was linked and contained similarly binding language to the previous CSA. [22-10] at 11-12.

On January 18, 2023, Plaintiff brought this putative class action against Hyundai. [1]. On May 30, 2023, Hyundai filed the instant motion to compel arbitration and stay proceedings. [20].

**II. Standard**

Under the Federal Arbitration Act "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Act "mandates that district courts *shall* direct parties to proceed to arbitration on issues as to which an

arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). It reflects a "liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and places "arbitration agreements on an equal footing with other contracts." *Gore v. Alltel Comm'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *Concepcion*, 563 U.S. at 339). "When deciding whether parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Rest., Inc. v. Steak N Shake Enterp., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014). "Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 619 (7th Cir. 2021) (cleaned up).

Under the FAA, in response to an opposing party's refusal to arbitrate despite a written agreement for arbitration, a party "may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The party seeking to compel arbitration bears the burden to show an agreement to arbitrate. *Id.*; *see A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). "The court may consider exhibits and affidavits regarding the arbitration agreement in question." *Reineke v. Circuit City Stores, Inc.*, 2004 WL 4426239, at *1 (N.D. Ill. 2004). Once the moving party makes its initial showing, the party resisting arbitration bears the burden of identifying a triable issue

of fact on the purported arbitration agreement. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The resisting party's evidentiary burden is like that of a party opposing summary judgment. *Id*. "[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id*. As with summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws reasonable inferences in its favor. *Id*. If the party opposing arbitration identifies a genuine issue of fact as to whether an arbitration agreement was formed, "the court shall proceed summarily to the trial thereof." *Id*. (quoting 9 U.S.C. § 4).

### III. Analysis

Plaintiff disputes that he contracted to arbitrate his claims in the first place, and additionally argues that the agreement, to the extent there is one, is unconscionable. [26] at 1-2. Arbitration is a matter of contract so the Court must first decide whether a contract has been formed before it can order arbitration. *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022) (citing *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643 (1986)).

#### A. Enforceable Arbitration Agreement

State law controls the determination of this issue. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). Under Illinois law,[2] an enforceable contract requires an offer, acceptance, and consideration. *Jefferson v. Credit One Bank, N.A.*,

---

[2] The parties agree that Illinois law applies. [21] at 8; [26] at 5.

No. 21 C 532, 2021 WL 4894704, at *3 (N.D. Ill. Oct. 20, 2021) (citing *DiLorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 678 (Ill. App. Ct. 2004)). Illinois courts further require mutual assent, or a "meeting of the minds". *Acad. Chi. Publishers v. Cheever*, 144 Ill. 2d 24, 578 N.E.2d 981, 984 (Il. 1991); *see also Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016).

1. *Mutual Assent*

Plaintiff focuses on the original CSA enrollment process, specifically arguing there was no mutual assent to contract because he did not know he was enrolled in the CSA. [26] at 5. Plaintiff denies that he was originally given the *opportunity* to enroll in the CSA, let alone did so. Such denial can create a genuine dispute of fact, necessitating a trial to resolve the dispute. *See Kass v. Paypal*, 75 F.4th 693, 704-05 (reasoning denial is an assertion of fact which can create a genuine dispute). If Hyundai was moving to compel on the 2017 CSA enrollment alone, the court would need to reach this issue. But Hyundai has moved to compel arbitration under the *later* versions of the CSA. Hyundai has provided unrebutted evidence that Plaintiff reactivated services in 2021 and logged into the mobile app in 2022, agreeing to the CSA three separate times. [21] at 2-3, 8-10; [28] at 2. The factual dispute Plaintiff raised is thus irrelevant to the Court's analysis, and this Court does not address the alleged unconscionability of the enrollment process.

2. *Click Wrap Agreements*

State common law contract principles apply even when contracts are formed via the internet. *Sgouros,* 817 F.3d at 1034. The relevant inquiry for contract formation

9

via the internet is: (1) "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement," and (2) "whether the circumstances support the assumption that the purchaser receives reasonable notices of those terms." *Id*. Such an inquiry is "fact-intensive". *Id*.

The CSAs at issue were assented to through a clickwrap, which is "common in internet commerce." *Treiber v. Straub, Inc., v. UPS*, 474 F.3d 379, 382 (7th Cir. 2007). This type of assent requires acceptance by actively clicking an "accept" button to proceed. *See Sherman v. AT&T Inc.*, 2012 WL 1021823, at *3 (N.D. Ill. Mar. 26, 2012) (describing clickwrap assent) (collecting cases). The clickwrap agreement must present the user with the opportunity to scroll through the terms posted. *Miracle Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at *4 (N.D.Ill. 2020). The clickwrap process of checking a box next to hyperlinked terms generally provides adequate notice to a user, and thus courts routinely uphold these agreements. *Id*. Given the fact intensive nature of the inquiry, the precise wording and formatting is relevant.

Here, Plaintiff agreed to the arbitration provision in the CSA when he logged into the Customer Web Portal in 2021 to reactivate his connected services. [22] at ¶¶ 9-11. He clicked an accept button that stated, "By clicking login, you agree that you have read our Privacy Policy, and if you are a connected service provider subscriber, agree to the Terms and Conditions." *Id*. The underlined text "Terms and Conditions" directly linked to the CSA. *Id*. When Plaintiff clicked "log in", he assented to the CSA. This process establishes offer and acceptance under Illinois law. *See Sherman*, 2012 WL 1021823, at *3 (finding adequate notice and assent where plaintiff clicked the "I

10

have read and agree to the AT&T terms of Service." button). Plaintiff further assented to the terms of the CSA when he clicked "I accept" a second and third time while resubscribing in 2021 and logging into the mobile app to access the connected services in 2022. *See Acely v. Vimeo, Inc.*, 464 F.Supp.3d 959, 966 (N.D. Ill. June 1, 2020) (finding adequate notice where plaintiff opened an app, viewed its welcome page which stated, "By continuing to I agree to the terms", and used the app). To access the mobile app, Plaintiff clicked a box acknowledging he agreed to the "Hyundai Terms and Conditions." He was then presented with a link to the CSA, and affirmatively clicked that he agreed to the CSA. In sum, Plaintiff assented to the later versions of the CSA three separate times.

Plaintiff argues it is unfair and amounts to duress to require to Plaintiff to agree to new and updated terms years later, which were never disclosed to him, or else risk cancellation of Blue Link and connected services. [26] at 11-12. This argument fails. "Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will." *Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680, 682 (7th Cir. 1970) (citing *Kaplan v. Kaplan,* 182 N.E.2d 706, 709 (Ill. 1962). Hyundai's CSA, which requires a user to assent to its terms and conditions to access Hyundai's services, does not meet the high standard of duress. The user can simply refuse to accept the terms, but in so doing would have to forego the service. Plaintiff thus had free will to accept or refuse the terms and chose to click "I accept".

11

### B. Unconscionability of the CSA

Plaintiff argues that the CSA contains unfair and unconscionable provisions. [26] at 12. Under Illinois law, contract provisions may be procedurally or substantively unconscionable. *Razor v. Hyundai Motor Am.*, 654 N.E.2d 607, 622, 222 Ill. 2d 75, 305 Ill. Dec. 15 (2006). A contract is substantively unconscionable when it is "so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Kinkel v. Cingular Wireless, LLC*, 223 Ill.2d 1, 28 (2006). At top, Plaintiff focuses on the 2017 CSA, which is not at issue. But elements of the argument apply to the 2021 and 2022 CSAs, and the Court therefore addresses it in turn.

Plaintiff claims the CSA is unconscionably broad, requiring users to accept the CSA to receive and use the connected services that are part of the vehicle already purchased. [26] at 13. This is not substantively unconscionable. Hyundai owners are free to use the Blue Link and connect services or forego its use. The CSA does not oppress or surprise an innocent party, require more rights or obligations of the user (where Hyundai has bilaterally agreed to arbitration and is providing services in exchange), or cause significant cost disparity between the parties.

Plaintiff further argues it's unconscionable for the CSA to provide that users are bound by the agreement and any later changes or amendments to it. *Id.* This argument is unpersuasive. The CSA provides that a subscriber can reject the amendment by cancelling the connected services. [22-6] at 4. Failure to do so within 30 days constitutes an agreement to the change. *Id.* Illinois courts routinely uphold

12

such provisions. *See Miracle-Pond*, 2020 WL 2513099, at *5. The Court therefore does not find the CSA substantively unconscionable.

### C. Scope and Enforceability of the CSA

As a final matter, once a contract is found, "an arbitration clause may delegate all other issues, including defenses, to the arbitrator..." *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022). The evidence presented by Hyundai demonstrates that there is a valid and enforceable agreement to arbitrate. Whether the claims raised by Plaintiff are arbitrable is a question delegated to the arbitrator.

## IV. Conclusion

Accordingly, Hyundai's motion to compel arbitration [20] is granted. This case is stayed pending arbitration. The Parties are to file a status report by April 19, 2024.

E N T E R:

Dated: January 2, 2024

MARY M. ROWLAND
United States District Judge